# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### COLUMBUS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JOLIE JOHNSON and DEBBIE HELMLY<br>and<br>STATE OF GEORGIA ex rel. JOLIE JOHNSON and DEBBIE HELMLY,<br><br>     Plaintiff-Relators,<br><br>     v.<br><br>EXCELSIOR AMBULANCE SERVICE, INC., DR. JAMES A GRAHAM, SERENITY HOSPICE CARE, AND MEDIXX TRANSPORT, LLC<br><br>     Defendants.<br>_____ | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**Civil Action No.** 4:16-cv-321-CDL _____<br>**Jury Trial Demanded**<br><br>**FILED UNDER SEAL** |

## COMPLAINT

The United States of America and the State of Georgia, by and through Relators Jolie Johnson and Debbie Helmly, bring this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act") and O.C.G.A. § 49-4-168.1, *et seq.* ("Georgia False Medicaid Claims Act") to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and Relators, and the State False Medicaid Claims Act on behalf of the State of Georgia and Relators, and show the following:

## I.   JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.* and Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq.*

2.      This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

3.      This Court has subject-matter jurisdiction over this action pursuant to U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a) and O.C.G.A. § 49-4-168.6.

## II.   THE PARTIES

5.      Defendant Excelsior Ambulance Service, Inc. ("Excelsior") is a privately owned ambulance organization established in 2011 that provides emergency medical service and non-emergency ambulance transports for the residents of Middle and Southeast Georgia.  It has offices located at 108 Polly Ogden Lane, Baxley, Georgia 31513 and 1497 Ohio Ferro Road, Montgomery, Alabama 31513.  It has ambulance services in the Baxley, Saint Mary's, Statesboro, and Sparta, Georgia areas.  In 2014, Excelsior also started managing Long County EMS

2

in Ludowici, Georgia.

6.    Dr. James A. Graham, M.D. is the Owner, Administrator, CEO, and President of Excelsior Ambulance Service, Inc.  Dr. Graham is also an Emergency Room doctor for Bacon County Hospital.

7.    Defendant Medixx Transport, LLC ("Medixx") was founded in 2011 and is a non-emergency ambulance transport that provides medical transport for patients that require the assistance of EMT or Paramedic Personnel. The Articles of Organization filed with the Georgia SOS state the principle address for Medixx Transport, LLC is 510 Bellevue Avenue, Dublin, Georgia 31021.  This address is actually the address of Serenity Hospice's main office.  Medixx locations also include Statesboro, Soperton, and Warner Robbins, Georgia, and Austin Texas.

8.    Relator Debbie Helmly began working in the medical industry in 1979. She is an RN and has worked in various organizations as such.  She has also been a healthcare administrator and worked a short stint with Fresenius Medical Care.  At one point, she owned her own hospice company.

9.    Relator Jolie Johnson has an extensive background in the medical field in South Georgia and has built connections throughout the system.  She started in the field in 1997.

3

## III.   STATUES AND REGULATIONS

### A. <u>Medicare and Medicaid Programs</u>

10.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program.  The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

11.     The Medicare program consists of several parts.  Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care.  42 U.S.C. § 1395c-1395i-2 (1992).  Medicare Part B is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products including the treatments at issue in this complaint.  42 U.S.C. § 1395(k), 1395(i), 1395(s).  Reimbursement for Medicare claims is made by the United States through CMS.  CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the carriers act on behalf of CMS.  42 C.F.R. § 421.5(b) (1994).

12.     In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations

promulgated under the Act, and all applicable policies and procedures issued by the states expressly state that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid. 42 C.F.R. § 455, *et seq*.

13.     Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (1) bill Medicare for only those covered services which are medically necessary; (2) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (3) not engage in any act or omission that constitutes or results in over-utilization of services; (4) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (5) comply with state and federal statutes, policies and regulations applicable to Medicare; and (6) not engage in any illegal activities related to the furnishing of services to recipients.

14.     Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*., establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered,

payment levels for services and administrative and operational procedures. Medicaid authorizes grants to states for medical assistance to children and blind, aged, and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care.  42 U.S.C. § 1396; 42 C.F.R. § 430.0; 42 U.S.C. § 1396-1396v.  The Medicaid Program is jointly funded by the federal government and participating states.

15.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program.  Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.  By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid.  In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

16.     At all times relevant to this Complaint, Defendants were participating as a Medicare/Medicaid providers.

6

17.    At all times relevant to this Complaint, Medicare/Medicaid constituted and continues to constitute a significant source of revenue for Defendants.

18.    Defendants submitted or caused to be submitted false claims for payment to Medicare/Medicaid for services and supplies.

## B. Ambulance Services

19.    Medicare Part B covers emergency ground ambulance transportation to or from a hospital, critical access hospital (CAH), or skilled nursing facility (SNF) only when other transportation could endanger the patient's health.  In some cases, Medicare may cover ambulance services for End-Stage Renal Disease (ESRD) when transportation is needed to or from a dialysis facility. There are multiple factors that contribute to whether ambulance transport is covered for dialysis.

20.    Medicare may cover emergency ambulance transportation if someone is in shock, unconscious, or bleeding heavily or if someone is in need of skilled medical treatment during transportation.

21.    Medicare will only cover ambulance services (ground or air) to the nearest appropriate medical facility that is able to give the patient the care needed.

22.    In some cases, Medicare may cover limited, medically necessary, non-emergency ambulance transportation if such transportation is needed to obtain treatment or diagnose of health condition, if the use of any other transportation

7

method could endanger the patient's health or if there is a doctor's written order stating that ambulance transportation is necessary due to the medical condition.

23.   For non-emergency, scheduled, repetitive ambulance services, the ambulance supplier must get a written order from the patient's doctor before the patient gets the ambulance service. The doctor's written order must certify that ambulance transportation is medically necessary and must be dated no earlier than 60 days before the ambulance service.

24.   When a person gets ambulance services in a non-emergency situation, and the ambulance company believes that Medicare may not pay for the service, an "Advance Beneficiary Notice of Noncoverage" (ABN) must be given.

25.   Medicare Part B beneficiaries may seek direct reimbursement from Medicare or may assign the right to reimbursement to the provider of services.  42 U.S.C. § 1395u(b)(3).  Most providers of ambulance service accept assignment of Medicare benefits from patients and submit claims for reimbursement to the Medicare Carrier that administers Part B claims on Medicare's behalf.

26.   For ambulance transportation, the Carrier pays 80% of the provider's reasonable costs and the beneficiary is responsible for the remaining 20% of the costs which may be covered by Medicaid.  See 42 USC § 1395x(v); 42 C.F.R. § 403.501 et seq.

8

27.    The expense of ambulance transportation is reimbursable under Medicare Part B when the use of other methods of transportation "is contraindicated by the individual's condition, but only to the extent provided in the regulations." 42 USC § 1395x(s)(7). The pertinent regulation provides for reimbursement only when other means of transportation would endanger the beneficiary's health. 42 C.F.R. § 410.40(b)(1) (emphasis added).

28.    Medicare reimburses ambulance providers for transporting Medicare patients only to "covered destinations" and only when transportation for the service is reasonable and a medical necessity.

29.    The Medicaid Carriers Manual (MCM) contains HCFA's interpretative rules for reimbursement of Medicare claims. Under MCM § 2125, the three conditions for payment of claims for ambulance transportation are (1) the patient was transported by an approved supplier of ambulance service; (2) the patient was suffering from an illness or injury which contraindicated transportation by other means; and (3) the patient was transported from and to covered origins and destinations.

30.    Transportation by means other than an ambulance is contraindicated only when the patient (1) was transported in an emergency situation, e.g. as a result of an accident, injury or acute illness; (2) needed to be restrained; (3) was

unconscious or in shock; (4) required oxygen or other emergency treatment on the way to his destination; (5) had to remain immobile because of a fracture that had not been properly set or because of the possibility of a fracture; (6) sustained an acute stroke or myocardial infarction; (7) was experiencing severe hemorrhage; (8) was bed-ridden before and after the ambulance trip; or (9) could be moved only by stretcher.  MCM § 2125.3

31.    Under the Georgia Medicare Ambulance Guidelines (GMAG), which are based on the MCM, "bedridden" means bed confined or bed imprisoned.  It does not apply to a patient who is able to ambulate with assistance or stays in bed most of the time.  The patient must be unable to get out of bed without assistance, be unable to ambulate even with assistance, and be unable to sit in a chair or use a wheelchair. GMAG 12/93, p. 2.

32.    The GMAG states that ambulance service is not covered when transportation by wheelchair coach, medicar, taxi, private car, or other vehicles would not endanger the patient's health.  GMAG 12/93, p. 1.

33.    Covered origins and destinations for ambulance transportation include (1) from the patient's residence to a hospital or skilled nursing facility; (2) from a hospital to a skilled nursing facility or from a skilled nursing facility to a hospital; (3) from a hospital to a hospital or a skilled nursing facility to a skilled nursing

facility; (4) from a hospital to a hospital or a skilled nursing facility to a skilled nursing facility, or from a hospital or skilled nursing facility to the patient's residence; and (5) round-trips for hospital or participating skilled nursing facility in-patients to the nearest hospital or non-hospital facility where necessary therapeutic and diagnostic services (e.g., dialysis) are available.  MCM § 2125.3.

34.   Under § 2120 of the MCM, non-hospital based and free-standing dialysis centers are covered destinations only if the patient is an in-patient at a hospital or a skilled nursing facility.  When the patient is not an in-patient at a skilled nursing facility, the only covered destination is a hospital or another skilled nursing facility.  42 C.F.R. § 410.40(c) (emphasis added).  Thus, for ESRD patients who are not residents of a skilled nursing facility, transportation for dialysis is compensable only if other means of transportation are contraindicated and the destination is a hospital based dialysis center.  Transports to a free-standing ESRD from a residence or non-skilled nursing facility are not covered.  GMAG 12/93, p. 4.

35.   A beneficiary receiving maintenance dialysis on an outpatient basis is not ordinarily ill enough to require ambulance transportation for dialysis treatment. MCM 2120.3.  Thus, transportation to any dialysis facility is covered only if the patient is bed-confined before and after the trip or could only be moved by stretcher. GMAG 12/93, p. 3.

## C. Hospice Coverage

36.     Serenity Hospice is a for-profit hospice provider.  Serenity Hospice significantly funds its operations and employees through receipt of Medicare/Medicaid dollars on behalf of individuals who are supposed to be eligible to receive Medicare/Medicaid hospice benefits.  One of the purposes of the Medicare and Medicaid hospice requirements is to ensure that the limited funds available are properly spent on patients who are dying and need end of life care.

37.     In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22; 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20.   According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."   As discussed further below, there also must be specific medical information supporting the certification of terminal illness.

38.     While elderly patients may qualify for a variety of other medical services paid by Medicare/Medicaid, for-profit hospice companies like Serenity Hospice are entitled to receive Medicare/Medicaid dollars only for Medicare/Medicaid recipients who are "terminally ill."

39.     When a business such as Serenity Hospice admits a Medicare/Medicaid

recipient to hospice care, that individual no longer receives, or is entitled to receive, services that would help to cure his or her illness.  Instead the individual receives what is called palliative care, or care that is aimed at relieving pain, symptoms, or stress of terminal illness, which includes a comprehensive set of medical, social, psychological, emotional, and spiritual services.  For this reason, electing hospice care is often a critical medical decision for a patient who has been informed that his or her death is imminent.  It is clear that Congress authorized funding from limited Medicare/Medicaid funds for this specialized benefit during the last several months of an individual's life.  To be covered, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions.

40.    The statutory basis for the Medicare hospice benefit is found in the Social Security Act: Sections 1812(a)(4) and (d) (scope of benefits and benefit periods); 1813(a)(4) (coinsurance); 1814(a)(7) and 1814(i) (requirement for written certifications; payment for hospice care); 1861(dd) (services covered and conditions for hospice programs); and 1862(a)(1)(C), (6), and (9) (limits on hospice coverage). The implementing regulations are found primarily at 42 C.F.R. Part 418 (the "Regulations").

41.    The Regulations require that eligible individuals who wish to elect

hospice care file an election statement with a particular hospice.  42 C.F.R. § 418.24. The hospice then files a notice of election with Medicare to begin the per diem payments.  After two initial periods of 90 days, an individual may continue to receive hospice care for an unlimited number of 60-day periods, as long as he or she continues to be re-certified as terminally ill.  Social Security Act § 1812(d)(1); 42 C.F.R. § 418.21; Medicare Benefit Policy Manual, Ch. 9 §§ 10, 20.1.

42.    For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the Medical Director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician. For subsequent eligibility periods after the initial 90 day period, a re-certification must be completed by either the Medical Director or another physician at the hospice.  42 U.S.C. § 1395f (7)(A); 42 C.F.R. § 418.22.  The doctors must prepare this written certification before the hospice submits any claim for payment.  Social Security Act § 1812(a)(7); 42 C.F.R. § 418.21.  This certification, along with other clinical information and documentation that supports the patient's prognosis, must be filed in the patient's medical record with the hospice.  42 C.F.R. § 418.74.

43.    The written certification requires (a) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the

terminal illness runs its normal course; (b) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (c) the signature(s) of the physician(s).   42 C.F.R. § 418.74.; Medicare Benefit Policy Manual, Chapter 9, § 20.1.

44.    It is also required that a plan of care be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care.

45.    Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

46.    It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

### D. Obligations of the Hospice Provider

47.    All Medicare and Medicaid providers must enroll in the respective programs as providers, and are expected to deal honestly with the Government and with patients.

48.    In addition, all healthcare providers, like Serenity Hospice and its related entities, are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare and Medicaid.  When participating in Medicare and Medicaid, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of services, and, in the case of hospice care, to know that Medicare and Medicaid only reimburse for services that are reasonable and necessary for the palliation or management of terminal illness.  42 U.S.C. § 1395y(a)(1)(C).  They also have to properly train and inform their employees regarding the requirements for Medicare and Medicaid coverage of hospice services.

49.    Medicare regulations for hospice providers are set forth at 42 C.F.R. § 418.

50.    Since January 1, 2011, a physician or nurse practitioner must have a face-to-face encounter with every hospice patient "to gather clinical findings to determine continued eligibility for hospice care" before recertifying a patient for more than 180 days of hospice services and prior to each subsequent recertification.

42 C.F.R. § 418.22(a)(4). "The physician or nurse practitioner who performs the face-to-face encounter with the patient . . . must attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit." 42 C.F.R. § 418.22(b)(4). "The attestation of the nurse practitioner or a non-certifying hospice physician shall state that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care." 42 C.F.R. § 418.22(b)(4). In addition to the Medicare regulations, these important requirements are also contained in the Medicare Benefit Policy Manual, Chapter 9, § 20.1, along with additional descriptions and guidance for hospice providers.

51.     Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "[a] hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare." 70 Fed. Reg. 70534-35.

52.     The clinical record for each hospice patient must contain "correct clinical information." 42 C.F.R. § 418.104. The hospice provider also must maintain clinical records that are "legible, clear, complete, and appropriately

17

authenticated and dated"; these records must include clinical notes such as nursing notes. 42 C.F.R. § 418.104; 42 C.F.R. § 418.310.

53. Among the regulatory requirements for hospice providers are the requirement that each hospice patient be treated by an interdisciplinary team. As specified by 42 C.F.R. § 418.56, the interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor. The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

54. In treating a hospice patient, the registered nurse assumes a particularly critical role, in that he or she is responsible for providing coordination of care, ensuring continuous assessment of each patient's needs, and ensuring implementation of the plan of care. 42 C.F.R. § 418.56(a); 42 C.F.R. § 418.100(a)(2). A registered nurse who provides direct "skilled care" must be present on each and every shift. Neither a licensed practical nurse nor certified nursing assistant is qualified to meet the requirements of 42 C.F.R. § 418.100(a)(2).

55. Each member of the interdisciplinary team must treat the patient according to an individualized plan of care, which is developed at the time of initiation of services and is updated no less than every 15 days. 42 C.F.R. §

18

418.56(b)-(d).  The hospice provider must also develop and maintain a system of communication and integration among the interdisciplinary team, to ensure that the plan of care is being followed, and to provide for the sharing of information among the team members and with non-hospice healthcare providers.    42 C.F.R. § 418.56(e).

56.    The Medicare hospice benefit covers a broad set of services for eligible beneficiaries, including physician services, nursing care, physical therapy, social services, homemaker services, medical supplies, short-term inpatient care, and bereavement counseling for the family.    Social Security Act § 1861(dd)(1)-(2). Hospice providers must make whatever services are necessary for the particular patient, including nursing services, available on a 24 hour basis.  Social Security Act § 1861(dd)(1)-(2); 42 C.F.R. § 418.50.  Eligible beneficiaries who choose to elect hospice care agree to forego all curative treatment for their terminal condition. Social Security Act § 1812(d)(2)(A); 42 C.F.R. § 418.24(d).

57.    Written plans of care must be established and maintained for each enrolled patient.  C.F.R. § 418.58, 68.  These plans must be established by the attending physician or the Medical Director in cooperation with an interdisciplinary team within the hospice.  C.F.R. § 418.58, 68.  The plans must be reviewed periodically by the team, including when determining whether to recertify a patient

as terminally ill, and that review must be documented.  C.F.R. § 418.58, 68.  The Medicare Regulations specifically note what documentation the hospice must keep for each individual.  42 C.F.R. § 418.74.

58.    The hospice provider also must "maintain an effective, ongoing, hospice-wide data-driven quality assessment and performance improvement program".  42 C.F.R. § 418.58.

59.    There are four levels of hospice care: (1) routine home care; (2) continuous care; (3) inpatient respite care; and (4) general inpatient ("acute") care.  Level 1 is commonly called "routine" care, and hospices may provide this level of care not only in private residences, but also in nursing homes and stand-alone hospice facilities.  Level 4 general inpatient care is sometimes called "acute" care.  It must be provided in a Medicare-certified hospice facility, hospital, or skilled nursing facility (42 C.F.R. § 418.98) with a registered nurse on-site to provide direct patient care 24-hours a day.  42 C.F.R. § 418.100(a)(2).

60.    Nursing services "must be made routinely available on a 24-hour basis 7 days a week."  42 C.F.R. § 418.100.  Nursing services must ensure that the patient's needs, as identified in the plan of care, are met.  42 C.F.R. § 418.64.

61.    To qualify for "general inpatient" or "acute" care, a patient must be in a free-standing hospice, a hospital, or a skilled care nursing home "for pain control

or acute or chronic symptom management which cannot be managed in other settings." 42 C.F.R. § 418.302(b)(4). This level is intended to be short-term. 42 C.F.R. § 418.98.

62.    As a condition of participation, hospices may provide care at the general inpatient level only for "short term" periods and only when medically indicated. The specific circumstances allowed by the regulations are "pain control" and "symptom management." 42 C.F.R. § 418.98 (a). A hospice is only allowed to bill the more expensive general inpatient level for brief periods when a patient is in an acute stage, needs stabilization, or is in transition. If the hospice patient does not qualify for the general inpatient level of care, then the patient receives routine care, and the patient or his/her family is responsible for the room and board whether at home, or in a nursing home.

63.    CMS provides the following guidance with regard to "Short Term Inpatient Care":

> General inpatient care may be required for procedures necessary for pain control or *acute* or chronic symptom Management that cannot feasibly be provided in other settings. *Skilled nursing care* may be needed by a patient whose home support has broken down if this breakdown makes it no longer feasible to furnish needed care in the home setting ... [A] *brief* period of general inpatient care may be needed in some cases when a patient elects the hospice benefit at the end of a covered hospital stay. If a patient in this circumstance continues to need pain control or symptom management which cannot be

feasibly provided in other settings *while the patient prepares to receive hospice home care*, general in patient care is appropriate. Other examples of appropriate general inpatient care include a patient in need of medication adjustment, observation; or other stabilizing treatment, such as psycho-social monitoring, or a patient whose family is unwilling to permit needed care to be furnished in the home.

CMS Medicare Benefit Policy Manual, Chapter 9, § 40.1.5 (emphases added).

64.    Medicare requires that at least eight hours of primarily nursing care are needed to manage an acute medical crisis.  Furthermore, "[w]hen a hospice determines that a beneficiary meets the requirements for [crisis care], appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation.  Medicare Benefit Policy Manual, Chapter 9, § 40.2.1.

65.    The hospice is responsible for determining the correct level of care for a patient through the patient's plan of care and the involvement of an interdisciplinary team.  It is incumbent upon the medical director to oversee this process to ensure that the level of care is appropriate.

### E. **Hospice Payment Process**

66.    Hospices are paid a per diem rate based on the number of days and level of care provided during the election period.  Medicare Benefit Policy Manual,

Chapter 9, § 40; 42 C.F.R. § 418.302. The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day. 42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Ch. 9, § 40. The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers. CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like Serenity Hospice. In this capacity, the Medicare claims processors act on behalf of CMS.

67.     Payments are typically made by Medicare directly to health care providers like Serenity Hospice rather than to the patient. The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider. The Medicare provider either submits its bill directly to Medicare for payment, or it contracts with an independent billing company to submit a bill to the Medicare claims processor, on the provider's behalf.

68.     Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements and trusts the providers to submit truthful

23

and accurate claims.   Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

69.     On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

70.     On the CMS-1450 form, the provider also certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

71.     All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

72.     The physician certifications and other documents that support the claim that hospice providers make to Medicare are submitted to Medicare only if the claim for hospice services is selected for medical review, which does not happen routinely.

24

Additionally, it is the hospice provider, like Serenity Hospice, and not the patient's primary care or treating physician, who is required to submit to Medicare the underlying documentation that supports the eligibility determination and the claim.

73.     In order to bill Medicare, a provider (such as Serenity Hospice) often submits a claim form known as a CMS Form 1500 to the appropriate fiscal intermediary (FI) or MAC.  Each time it submits a claim for payment by Medicare, therefore, a provider (such as Serenity Hospice) certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations.

74.     To be eligible for Medicaid reimbursement, providers must enroll in the Medicaid program.  They must declare under penalty of perjury that they are "responsible for the presentation of true, accurate and complete information on all invoices/claims submitted [to the fiscal agent]."

75.     It is not feasible for the Medicaid program, or its agents, to review each claim or patient file that supports a claim.   It does not employ doctors to review the certifications of eligibility or the medical records to ensure the hospice is complying with the requirements before paying claims.    Instead, the Medicaid program requires and trusts hospice providers to comply with the Medicaid requirements, and requires the providers to submit truthful and accurate claims.

76.     The hospice providers are required to submit certifications and other

25

documents to support claims to Medicaid.

77. Payment amounts are determined within each of the following categories:

> (1) Routine home care day. A routine home care day is a day on which an individual who has elected to receive hospice care is at home and is not receiving continuous care as defined in paragraph (b)(2) of this section.

> (2) Continuous home care day. A continuous home care day is a day on which an individual who has elected to receive hospice care is not in an inpatient facility and receives hospice care consisting predominantly of nursing care on a continuous basis at home. Home health aide (also known as a hospice aide) or homemaker services or both may also be provided on a continuous basis. Continuous home care is only furnished during brief periods of crisis as described in § 418.204(a) and only as necessary to maintain the terminally ill patient at home.

> (3) Inpatient respite care day. An inpatient respite care day is a day on which the individual who has elected hospice care receives care in an approved facility on a short-term basis for respite [this is respite for their regular caretakers].

> (4) General inpatient care day. A general inpatient care day is a day on which an individual who has elected hospice care receives general inpatient care in an inpatient facility for pain control or acute or chronic symptom management which cannot be managed in other settings.

42 C.F.R. § 418.302(b).

78. To bill Medicare for crisis care, a hospice must provide care that is: (1) designed to palliate the patient's acute medical symptoms, (2) provided to the patient for at least eight hours in a 24-hour period, counted from midnight to midnight, and

26

(3) predominantly nursing care, meaning care provided by a registered nurse (RN), licensed practical nurse (LPN), or nurse practitioner (NP).  42 C.F.R. §§ 418.302, 418.204.  If the care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for routine home care for that day of hospice services.  Similarly, if the care provided does not consist of predominantly nursing care, the hospice may not bill Medicare for crisis care and must instead bill for routine home care.  42 C.F.R. §§ 418.302, 418.204.

79.    Medicare also reimburses hospices for evaluation and management (E&M) services rendered by physicians in the hospice setting.  Claims for these services are submitted using CPT codes.  E&M services are billed to Medicare using CPT codes 99334, 99335, 99336, and 99337 for established patients and 99324, 99325, 99326, 99327, and 99328 for new patients.

80.    Medicare pays the highest reimbursement for CPT codes 99336 and 99337 (Level 3 and Level 4 for established patients) and 99327 and 99328 (Level 4 and Level 5 for new patients).  Billing at Levels 3, 4 and 5 codes requires that the physician has provided a more complete patient history, a more comprehensive examination, and medical decision involving a higher level of complexity, than the services provided at Levels 1 or 2.

81.    The  per  diem  rate  for  hospice  services  is  deemed  to  include  all

administrative, clinical and medical duties performed by the hospice's Medical Director, such as supervisory duties, quality assurance duties, assessments of patients' eligibility for hospice, participation in the establishment, review and updating of plans of care, supervising care and services, and establishing governing policies.  42 CFR § 418.304(a); Medicare Claims Processing Manual, Ch. 11 § 40.1.1.

## IV.    DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBITTED FALSE AND FRAUDULENT CLAIMS

82.    This case involves ambulance service providers billing Medicare and Medicaid for patients ineligible to receive Government-funded Ambulance services. From the date Excelsior and Medixx opened to the present, they (and their owners and affiliated entities) have wrongfully obtained monies from Medicare and Medicaid for medical services and non-emergency ambulance transports.

83.    Defendants focused on maximizing Medicare and Medicaid reimbursement for as many patients as possible while disregarding patients' medical needs and regulatory requirements.

84.    Angie Hanson is the main nurse who works for Dr. Graham at Excelsior doing the certifications so that Medicare would pay for transport.  Nurse Hanson would fraudulently certify that an ambulance was necessary in order for funds to be paid by Medicare. For example, Nurse Hanson would write down that a patient's

28

glucose needed to be monitored and would require an ambulance.

85.    Excelsior would take the patients straight to dialysis.  Hanson would also certify that a patient on oxygen would need an ambulance so that they could monitor the oxygen.  These types of things were done so that the patients appeared to meet the criteria for Medicare/Medicaid to pay for transport rather than using non-emergent transport or having family driving them.

86.    Nurse Hanson has admitted to both Relator Helmly and Relator Johnson on numerous occasions that she would falsify documentation to meet criteria so that the patients could be transported to dialysis by Excelsior and Excelsior would receive payment from either Medicare or Medicaid depending on the payor source.  These conversations took place as early as 2013 and continued for a year or more.

87.    Medixx also committed Medicare/Medicaid fraud by fraudulently certifying their patients for a higher acuity than they actually qualified for which allowed Medixx to receive a higher reimbursement for transport of these patients. As they have been highly involved in the medical community of Middle and South Georgia for many years, Nurses have specifically told Relators that Medixx was involved in improper transport of dialysis patients that did not meet the need of necessity for non-emergent transport according to the criteria set forth by Medicare

29

and Medicaid regulations.  Many of these patients were transported to DaVita.

88.     Because Defendants routinely certified patients as being eligible for ambulance transportation who they knew were ineligible and they falsified patients' medical records in support of their claims for reimbursement, Defendants have knowingly submitted or caused to be submitted fraudulent records and statements in support of their false claims for payment to Medicare and Medicaid.

89.     As a result of this conduct, Defendants are liable under the False Claims Act, 31 U.S.C. § 3729, et seq. and the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, et seq.

90.     Defendant Medixx is owned by Defendant Serenity.

91.     In addition to the fraud conducted by Medixx, Serenity is also admitting unqualified patients to its hospice care.

92.     One example of this fraud is PM.  She is a patient with Serenity Hospice through its Columbus location.  She is so clearly not a hospice candidate that even a layman could determine it with just one short visit.  Ms. M suffers from Diabetes and has recently received a pace maker.  However, Ms. M lives a normal life unhindered by either medical issue.  There has been no decline in her health, and she has never been told she is dying.  In fact, she recently left Columbus for a three week vacation.  She is visiting with her sister in Mississippi.  She routinely shops, cooks,

30

cleans, and runs errands.  She plays games with family and friends including games of pool.  She goes upstairs and downstairs and indoors and outside to participate in games or conversation just like a normal person.  She has also helped to take care of horses and other animals.  Not only is there no medical basis for hospice care, it is obvious to all caretakers, family, and friends that Ms. M is not "dying".

93.    All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" or with reckless disregard, as those terms are defined in the False Claims Act, 31 U.S.C. § 3729 and related case law.

### FIRST CAUSE OF ACTION
### (False or Fraudulent Claims)

94.    Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

95.    As set forth above, Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government and the State of Georgia numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1).

96.    Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

97.    The United States and the State of Georgia are entitled to treble

31

damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

98.     The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

99.     Relators are also entitled to their attorney's fees and litigation expenses.

## SECOND CAUSE OF ACTION
### (False Statements)

100.    Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

101.    As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(2).

102.    Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

103.    The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

104.    The United States and the State of Georgia are entitled to the largest

civil penalty allowed by law for each of the false claims.

105.   Relators are also entitled to their attorney's fees and litigation expenses.

## THIRD CAUSE OF ACTION
### (Failure to Repay)

106.   Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

107.   As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the United States Government and the State of Georgia and  knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the United States Government and the State of Georgia, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(7).

108.   Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

109.   The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

110.   The United States and the State of Georgia are entitled to the largest

civil penalty allowed by law for each of the false claims.

111.   Relators are also entitled to their attorney's fees and litigation expenses.

### FOURTH CAUSE OF ACTION
### (Conspiracy)

112.   The allegations contained in the preceding paragraphs are re-alleged as if fully set forth below.

113.   In the factual allegations set forth above, Defendants Serenity and Medixx, by and through their officers, agents, and employees, conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid in violation of 31 U.S.C. § 3729(a)(1)(C) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(3).

114.   Defendants, by and through their officers, agents, and employees, authorized their various officers, agents, and employees to take the actions set forth above.

115.   As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729(a)(1)(C) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(3) and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

116.   In addition, Defendants Graham and Excelsior, by and through their officers, agents, and employees, conspired to defraud the United States Government

by getting false or fraudulent claims allowed or paid in violation of 31 U.S.C. § 3729(a)(1)(C) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(3).

117.   Defendants, by and through their officers, agents, and employees, authorized their various officers, agents, and employees to take the actions set forth above.

118.   As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729(a)(1)(C) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(3) and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators Jolie Johnson and Debbie Helmly pray for judgment:

a.   awarding the United States and the State of Georgia treble damages sustained by them for each of the false claims;

b.   awarding the United States and the State of Georgia the largest civil penalty allowed by law for each of the false claims;

c.   awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

d.     awarding Relators their litigation costs and reasonable attorney's fees;

and

e.     granting such other relief as the Court may deem just and proper.

Respectfully submitted,

_____

Mike Bothwell
Ga Bar No. 069920
Mike@WhistleblowerLaw.com
Attorney for Relators

**BOTHWELL**
LAW GROUP
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442